## STRIPLIN *vs.* WARE.

[BILL IN EQUITY FOR REMOVAL OF MOTHER FROM GUARDIANSHIP OF INFANT CHILDREN.]

1. *Mother's right, as guardian, to custody of infant children.*—Under the statutes of this State, (Code, §§ 2014-15,) as at common law, the mother is entitled, on the death of the father, to the custody of infant children under fourteen years of age; but this right is not beyond the control of courts of justice.
2. *Removal of mother from custody of infant children.*—The chancery court will remove infant children from the custody of their father or mother, whenever it is clearly shown that their morals, safety or interests require their removal; but this jurisdiction is one of extreme delicacy, and will only be exercised in cases of gross misconduct on the part of the parent, or inability from some cause to furnish proper nurture and training for the child: the fact that the second husband of the mother, who shares with her the care and

Striplin v. Ware.

management of her infant children, is not a man of unexception-
able morals, and is addicted to profanity, even in the presence of
his family, is not sufficient cause for the removal of the children
from the custody of the mother, against her wishes, when it is
shown that they are treated kindly, are well fed, well clothed, and
sent to school; that no charge is made for their board or lodging,
and that they are of such tender years as to require their mother's
constant watchfulness and care.

APPEAL from the Circuit Court of Randolph.
Heard before the Hon. JOHN FOSTER.

THE bill in this case was filed by William M. Striplin,
Samuel A. Striplin, and Georgiana Striplin, infants suing
by their next friend, against their mother, Mrs. Secluda
A. Ware, and her present husband, William J. Ware;
and sought to have Mrs. Ware removed from the guardi-
anship of the persons and estates of the complainants,
and deprived of their custody and control. Each of the
defendants answered, and denied all the material allega-
tions of the bill. On final hearing, on pleadings and
proof, the chancellor dismissed the bill, at the costs of the
complainants' next friend; and his decree is now assigned
as error.

JOHN T. HEFLIN, for appellants.
JAS. B. MARTIN, contra.

R. W. WALKER, J.—Sections 2014 and 2015 of the
Code are in the following words: "§ 2014. When a minor
has a father living, and has an estate in his own right, a
guardian must be appointed for him; and his father, if a
suitable and proper person, and willing to give bond and
qualify as guardian, is entitled to a preference. No such
guardian can exercise any control over the person of his
ward, during the life of the father; or during the life of
the mother, if the ward is a female, or a male under the age
of fourteen years." "§ 2015. Guardians may be appointed
by the last will and testament of the father, if the right
is claimed within six months after the will is admitted to
probate. Such guardian must give bond with surety, as

Striplin v. Ware.

other guardians appointed in the usual mode; but the mother is entitled to the custody of the person of the ward, until it is fourteen years of age."

In the present case, the children, whose custody is the subject of controversy, are all under the age of fourteen years, and their father is dead.    It is clear, therefore, that the sections just quoted confer the right to the custody of their persons upon their mother.    This provision of our statute is in harmony with the common law, which wisely declares that, upon the death of the father, the mother becomes the guardian, by nature and nurture, of her infant children.—2 Kent's Com. 205, 220; 4 Johns. Ch. 80; McPherson on Inf. 66, 72; People v. Wilcox, 22 Barb. 184; 3 Lead. Cases Eq. 263–4.

But this right of the mother, whether arising under the statute, or under the common law, is not so absolute as to be beyond the control of courts of justice.    The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for.    When, however, this presumption is removed, and the morals, safety, or interests of the children, strongly require their withdrawal from the custody of the father or mother, the court of chancery (which is the general guardian and protector of all infants within its jurisdiction) will interfere, and place the care and custody of them elsewhere.—2 Kent, 205, 220–7; 2 Story's Eq. § 1340; Wellesley v. Wellesley, 2 Bligh, 128–30; De Manneville v. De Manneville, 10 Vesey, jr. 63, &c.; 3 Lead. Cases. Eq. (edit. 1859) 270.

Although this jurisdiction is firmly established, and seems indispensable to the morals, the good order, and the just protection of civilized society, it is admitted to be one of extreme delicacy, and of no inconsiderable embarrassment and responsibility.—2 Story's Eq. § 1340. So strong is the presumption, that "the care which is

7

prompted by the parental instinct, and responded to by filial affection, is most valuable of all"; and so great is the reluctance of the court to separate a child of tender years from those who, according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare,—that the parental authority will not be interfered with, except in case of gross misconduct, or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion, to be disturbed, unless it plainly appears that the interests of the child require it to be set aside.—See 2 Story's Eq. § 1340; People v. Mercein, 25 Wend. 73; S. C., 8 Paige, 47; People v. Wilcox, 22 Barb. 178, (184); Ball v. Ball, 2 Simons, 35; 3 Lead. Cases Eq. 277. Whenever it is shown that the parent is guilty of gross ill-treatment or cruelty towards his infant children, or that his conduct or domestic associations are such that the children cannot associate with him without moral contamination, it is the duty of the court to interfere for their protection, and to appoint a suitable person to take care of them and superintend their education. 2 Story's Eq. § 1340; Anonymous, 2 Simons, N. S. 54.

The evidence in this case is wholly insufficient to show that the mother is, either physically or mentally, incapable of taking proper care of these children. The main ground on which the application seems to be rested, is the conduct and character of the mother's present husband, with whom she is now living, and who shares with her the care and management of these children. It is plain, we think, that nearly the whole of the testimony by which it is sought to establish those allegations of the bill which impeach the conduct and character of Wm. J. Ware, should be received with many grains of allowance. Most of the witnesses who testify to any very material facts in support of these allegations, hold unfriendly relations to Ware; and it is easy to see that their evidence is influenced, to some extent, (perhaps unconsciously,) by

prejudice or animosity. Still, it is obvious that the mother of these children is the wife of a man whose morals are, to use the mildest expression, somewhat exceptionable. He is much given to profanity; and it is a fair inference from the evidence, that he does not restrain himself, in this respect, in the presence of his wife and children. Some of the testimony tends to show, (though it is not, in our opinion, conclusive,) that at one time Ware was guilty of adulterous intercourse with slaves. The circumstances were, at least, so suspicious as to arouse the jealousy of Mrs. Ware, and create for a while great domestic disturbance between the husband and wife. It is shown, however, that if this adulterous intercourse ever in fact existed, it has ceased—the wife has become satisfied that the charge was untrue—the domestic peace has been restored, and the parties are living together in harmony.

The testimony of those of Ware's neighbors who are most intimate with his family, and visit his house most frequently, convinces us that he treats these children with kindness. There is no reason to apprehend, that, if they are permitted to remain where they now are, they will be in danger of being personally abused. They are well fed, well clothed, and sent to school; and no charge is made for their board or lodging. All the children are of tender years, and stand in need of that ever watchful care which none but a mother is likely to bestow, and for which it is next to impossible to find a substitute. The mother manifests a strong and very natural solicitude that she should not be deprived of the control and nurture of her children; and it is safe to presume, as a general rule, that a mother (the father being dead) would be more careful of the moral, intellectual and physical well-being of her children, than any other person in the world. If these children should now be separated from their mother, and placed under the charge of some third person, it is altogether likely that they would grow up comparative strangers to her, and her maternal attachment to them and their filial affection for her would, as a natural consequence, be materially weakened,—a result which could

not add to the happiness of either mother or children. While we admit the probability that a home, in some respects more suitable than the house of their step-father, could be provided for the children, we concur with the chancellor in thinking, that the absence of a mother's watchfulness and love would more than counterbalance any advantages arising from the change.

.Decree affirmed.