This action was initiated when Mr. and Mrs. Casteel, maternal grandparents of the *Page 732 
minor child Michele Renee Ely, filed a petition in the Colbert County Circuit Court seeking temporary and permanent custody of the child. On that same day they were awarded temporary custody. Gary Lee Ely, the natural father of Michele, responded by filing a motion seeking to have set aside the order awarding temporary custody to the Casteels and attacking the trial court's jurisdiction to decide the question of custody in the face of a Florida court's order giving custody of the child to him. After an ore tenus hearing the trial court rendered judgment, finding it did have jurisdiction of the matter, that Mr. Ely was unfit to be the child's custodian, that Michele's best interests and welfare would be served by placing her custody in the Casteels, that Mr. Ely would not be required to contribute to Michele's support and that he would not be allowed to visit Michele. From this decree, the father appeals.
Michele Renee Ely, the subject of this action, was born to Mr. Ely and Angela Jean Ely, his second wife. The couple was married in Lakeland, Florida, where each had grown up, but moved to Alabama where Angela's parents, Mr. and Mrs. Casteel, who had also moved from Lakeland, were living. Angela and Mr. Ely were divorced by the Circuit Court of Colbert County in May 1973 and Angela was given custody of Michele. After the divorce Angela returned with Michele to Lakeland, Florida; Mr. Ely also moved back to Lakeland. In November 1973 Angela married Donald L. Tomlinson.
Around April 12, 1974 Mr. Ely appeared at the home of Mr. and Mrs. Tomlinson, the parents of Angela's second husband, and picked up Michele, who was visiting with her stepgrandparents, to exercise his Easter visitation with the child. However, instead of returning Michele to Angela, Mr. Ely removed the child from Florida and took her first to Kokomo, Indiana, where his grandmother lived, and then to Rock Island, Illinois, where he had other relatives. At the time of the abduction, a restraining order and petition for suspension of visitation rights filed by Angela was pending against Mr. Ely.
Mr. Ely kept Michele until September 1975. During that time he did not notify Angela of the child's whereabouts. Angela and the Casteels made extensive efforts to locate the child, spending approximately $7,000 in the process. Finally, in August 1975, Angela learned that Mr. Ely and Michele were in Rock Island. During the first part of September 1975 Angela, her husband Donald, and a friend went to Illinois and recovered the child.
On the return trip to Lakeland, the family stopped in Florence, Alabama to visit the Casteels and Mr. and Mrs. Tomlinson, who had by this time also moved to Alabama. This was the first time the grandparents had seen Michele since she had been taken by her father sixteen months previously.
One day after Angela, Donald and Michele arrived back in Lakeland, September 14, 1975, Angela was fatally shot when a gun fell from a box being moved into an apartment, struck the floor and fired. Upon learning of the accident, the Casteels immediately drove to Lakeland. Angela died on September 16th. Several hours after Angela's death, Mrs. Casteel, without knowledge of Mr. Ely's presence in Florida, left Lakeland with Michele and returned to Florence. Michele has remained in Florence ever since that time.
Also on September 16th Mr. Ely arrived in Florida, unknown to the Casteels, and filed a petition for writ of habeas corpus against Donald Tomlinson seeking custody of Michele. Mr. Tomlinson was served with notice as he left his wife's funeral. The Florida court on that same day entered an ex parte order granting custody of Michele to her father, Mr. Ely, due to the death of the mother, and directing Mr. Tomlinson to return the child to the jurisdiction. The Casteels refused to allow Michele to return with Mr. Tomlinson to Florida.
On September 22, 1975 the Casteels, with full knowledge of the pending Florida proceedings and the Florida decree, filed the petition initiating the case now before this court. *Page 733 
In brief appellant presents three questions for us to decide:
 1. Whether the Circuit Court of Colbert County had jurisdiction to grant custody of the minor child Michele to her maternal grandparents.
 2. Whether the Circuit Court of Colbert County should have given full faith and credit to the Florida decree granting custody of Michele to her father.
 3. Whether the Circuit Court of Colbert County erred in awarding custody of Michele to her grandparents rather than to her father.
 I.
In this state a court of equity has inherent authority to act to protect the welfare and best interests of a child physically present within the court's jurisdiction. The court's equity jurisdiction is invoked by any pleading which on its face shows that the welfare of the child requires an order regarding the child's custody or support. Gray v. Department of Pensions andSecurity, 53 Ala. App. 19, 296 So.2d 918 (1974); Watkins v.Brannon, 54 Ala. App. 424, 309 So.2d 464, cert. den. 293 Ala. 778, 309 So.2d 468 (1974). It follows, then, that the existence of a valid decree of another state regarding custody of a child does not of itself defeat the jurisdiction of equity courts of this state where jurisdiction otherwise properly exists.
In the case before us, Michele was physically present in Colbert County and thereby within the jurisdiction of the circuit court of that county. Her welfare and custody were brought before the court by a petition alleging that the child was in ill health, was without a legal guardian and that her best interest would be served by placing her in the custody of her maternal grandparents. We therefore conclude that the Colbert County Circuit Court had jurisdiction of this action.
 II.
Mr. Ely next contends that the Colbert County Circuit Court was required to give full faith and credit to the Polk County, Florida Circuit Court decree giving custody of Michele to her natural father. Since the Casteels do not attack the validity of the Florida decree, we consider the decree validly rendered and one that must be dealt with.
The Supreme Court of the United States has held that where a forum court is faced with a custody decree rendered by the courts of a sister state, the forum court has as much leeway to disregard, qualify or depart from the foreign judgment as do the courts of the state where the judgment was rendered. Peopleof New York ex rel. Halvey v. Halvey, 330 U.S. 610,67 S.Ct. 903, 91 L.Ed. 1133 (1947). Following that decision we have said that if the courts of the state where a custody decree was rendered have the power to modify that decree, such decree is not conclusive in the courts of this state, and the courts of this state, on proper petition, have the same right to modify the decree as do the courts of the state where rendered. Grayv. Department of Pensions and Security, supra; Lawton v.McGough, 53 Ala. App. 423, 301 So.2d 188, cert. den. 293 Ala. 764, 301 So.2d 191 (1974).
According to Frazier v. Frazier, 109 Fla. 164, 147 So. 464
(1933), a child custody decree rendered by a Florida court is modifiable except as to facts and circumstances before the court at the time of the decree. Thus the Circuit Court of Colbert County could consider any changed circumstances which occurred between the time custody of Michele was awarded to Mr. Ely in Florida and the time of its final decree giving custody of Michele to the Casteels, and also could consider any new evidence not presented to the Florida court.
The Florida proceeding was ex parte; the Florida court did not see the Casteels or hear evidence presented on their behalf concerning their fitness to have custody of Michele. In Halvey, these facts alone were sufficient to allow the court of the forum to issue a decree contrary to that of a sister state. Therefore the Colbert *Page 734 
County Circuit Court had the authority to modify the custody of Michele as decreed by the Florida court.
 III.
The last question to be answered is whether the trial court erred by awarding custody of Michele to her maternal grandparents rather than to her natural father. We conclude there was no error.
Where the dispute over custody of a child is between the child's natural parent and a party who is not the child's natural parent, the natural parent has a prima facie right to the child's custody. However, the right is not absolute but is subject to the equally well settled rule that the best interests and welfare of the child are controlling in child custody cases. Borsdorf v. Mills, 49 Ala. App. 658,275 So.2d 338 (1973).
Ordinarily there is no conflict between these two principles, since it is presumed to be in the child's best interests to place custody in the parent. Kennedy v. State Department ofPensions and Security, 277 Ala. 5, 166 So.2d 736 (1964); Smithv. Jones, 275 Ala. 148, 153 So.2d 226 (1963). However, when the parent's fitness for custody is challenged, the principle of the best interests of the child outweighs parental rights.White v. Appleton, 53 Ala. App. 702, 304 So.2d 206 (1974);Borsdorf v. Mills, supra. To remove custody from the natural parent in such a case, there must be clear and convincing evidence that it would be against the best interests of the child to remain with the natural parent. Caine v. Caine,51 Ala. App. 607, 288 So.2d 147 (1973); Borsdorf v. Mills, supra.
We think the circumstances under which the Casteels assumed custody of Michele were clear and compelling. At the time Mrs. Casteel took Michele to her home in Florence, Alabama, Michele had no legal guardian since her mother, the legal guardian under a divorce decree, had been accidentally killed.
There is evidence that Mr. Ely loved and properly cared for his child during the sixteen months she lived with him in Rock Island, but during this period the mother, the legal custodian, had no knowledge of the whereabouts of the child. A statement by the police officer who assisted Angela and Donald in obtaining Michele from Mr. Ely indicated that Mr. Ely's home was very clean and neat and that Michele seemed to be a well-adjusted and happy child. However, the Casteels and the Tomlinsons, Michele's stepgrandparents, testified that when they saw Michele after she had been recovered from Mr. Ely she had sores on her head and bruises on her legs and buttocks. The sores did disappear after she was bathed. Michele also appeared to be quite frightened, would not speak, and was careful to lock doors behind her wherever she went.
The report prepared by a welfare worker in Rock Island said that the Ely home was clean and neat and that it was apparent Michele was loved and well-cared for. Mr. Tomlinson, on the other hand testified that at the time they picked up the child in October 1975 the outside of appellant's house was in disorder and had a rundown appearance. The foster mother who took care of Michele after she was removed from Mr. Ely and before she was given to Angela said that Michele was a happy, well-adjusted child.
After Michele was returned to her mother's custody, Mr. Ely made extensive efforts to obtain legal custody of his daughter. However, it also appears that Mr. Ely neglected his parental duties prior to the time he had physical custody of Michele. Mr. Ely has two children by his first marriage. During a period of three years from 1971 to 1974 both his first wife and Angela instituted various proceedings in the Circuit Court of Polk County, Florida, regarding non-support, requests for suspension of visitation rights, and restraining orders. There is evidence that Mr. Ely never made child support payments for Michele as directed by the decree divorcing him from Angela.
Furthermore, while Michele was in Angela's legal custody, Mr. Ely took Michele from her contrary to the directives of a court decree and kept the child for sixteen months, during which time Angela had no *Page 735 
knowledge of the child's whereabouts, even though she had used every means available to find her daughter. Mr. Ely relinquished the child only after Angela had used the authorities to enforce her legal claim to the child.
There was evidence that during the past two years Mr. Ely has held several different jobs. He has recently moved back to Florida where he briefly lived with his cousin, an ex-felon on parole. His third wife has begun divorce proceedings against him; however, she testified that she has directed her lawyer to cancel that action.
On the other hand, the Casteels appear to be fit to have custody of Michele. They are in their early forties and are healthy. Both work and the family income is substantial; they own their house. The welfare report stated that the Casteel home is nice, adequately furnished and clean. Michele has her own bedroom, of which she seemed proud. Michele was in good health, laughed, talked and appeared to be well-adjusted. Mrs. Casteel said that if awarded custody of Michele she would stop working and devote her full time to the child.
Where a case is heard ore tenus, it is for the trial court to resolve disputed testimony. The court's findings and conclusions will not be disturbed unless deemed to be plainly wrong. Sherk v. Sherk, 55 Ala. App. 345, 315 So.2d 437 (1975). Where the trial court has the benefit of seeing and hearing the witnesses and there is legal evidence to support its decree, this court will not substitute its judgment for that of the trial court. Harrell v. Long, 49 Ala. App. 322, 272 So.2d 248
(1973).
In view of the conflict in the evidence as to the fitness of the father to be the child's custodian, we cannot say that the trial court was plainly and palpably wrong in awarding the custody of Michele to her maternal grandparents. Consequently, the trial court's decree is affirmed.
AFFIRMED.
HOLMES, J., concurs.
WRIGHT, P.J., concurs specially.