The mother, Cathy Roland, appeals from an order of the Juvenile Court of Russell County terminating her parental rights to her daughter and placing the child's permanent custody with the Russell County Department of Pensions and Security for adoptive planning.
The mother argues that the trial court erred in terminating her parental rights. She contends that there is no proof of her unfitness as a parent or any strong proof of her neglect of the child. She also says that the court failed to consider less drastic measures than permanent removal of parental custody.
The evidence shows that in July 1980 the mother was found wandering in the streets of Phenix City, Alabama. She was seven months pregnant, had no income, and no residence. A Mr. Adams and his wife took Miss Roland in and allowed her to live in their home. They provided for her and the child after it was born.
The child, Shakeitha Marie, was born in September 1980. On December 18, 1980 the child was placed in DPS's custody. The mother agreed to the placement, as she was living with friends at the time, had no way to support herself, and recognized that she was unable to properly care for the child. There was evidence that the mother would at times overfeed the baby, would not change the baby's diapers, and would not dress the child properly for cold weather. There was also evidence that the mother was in poor mental health. Mrs. Adams testified she heard the mother say that the baby was a devil and had the mark of the beast. On another occasion the mother said to the child, "If you are going to act like a dog, I am going to treat you like a dog," and she took the child out of her crib and placed her on the floor. At the hearing the mother herself testified that the baby had given the Adamses' cat "distemper."
On December 23, 1980 the mother was committed to Griel Hospital. She was diagnosed as having a schizophrenic reaction, paranoid type, with strong depressive features. She was released from the hospital on March 24, 1981 with a prognosis of "guarded."
The record revealed that after her release from the hospital Miss Roland did not obtain employment nor did she establish a permanent residence. There was evidence that between March 24, 1981 and May 1982 the mother had resided in at least ten different locations and that her only income consisted of what people gave her. During this time DPS enrolled Miss Roland in a vocational rehabilitation program, but she failed to return after an initial visit. Counselling was arranged for her but she refused to go. Miss Roland also refused to take her medication.
DPS petitioned for permanent custody and termination of parental rights of the mother on April 15, 1982. At a hearing on May 5, 1982, DPS was awarded custody, and the mother's parental rights were terminated. This order was set aside and the court continued the case for review.
During the summer of 1982, the mother's situation improved. She began living with a couple, Mr. and Mrs. Mathews, in Seale, Alabama. She was more rational in her thoughts and outlook, and showed a real concern for her daughter's welfare. Moreover, she enrolled in a rehabilitation program *Page 307 
and was going to counselling sessions. DPS agreed to let the mother visit with the child on weekends provided the improvements continued. DPS even considered returning custody of the child to Miss Roland.
Instead of getting better, however, the mother's situation took a turn for the worse. There was evidence that the child's alleged father, who had never seen the child, began calling the mother from Florida and promised her that if she and the child would come to Florida he would marry her. On or about August 23, 1982 the mother left for Florida with the child in a car belonging to the Mathewses, which she sold in Georgia. She travelled to Florida, found out she'd made a mistake in doing so, and then hitchhiked with the baby to Tupelo, Mississippi. On September 21, 1982 the mother called the child's foster mother requesting that the foster mother send money. The foster mother convinced Miss Roland to let her come and get the child. There was evidence to show that when the child was picked up she was wet, dirty, and hungry, and was suffering from an ear infection, sore throat, stuffy nose, and severe diaper rash.
After a hearing on October 6, 1982, the trial court found that the mother had violated the terms of her agreement with DPS concerning visitation by leaving the state and had neglected the child by not obtaining proper medical care for her. There was also evidence that by leaving the state Miss Roland had violated the terms of a Georgia probation. She had been convicted of car theft in 1979 and put on three years' probation. The alleged father has made no contact with DPS or the child and has shown no interest in having custody of the child. There was evidence that DPS tried to locate the child's relatives, but that the maternal grandparents are deceased and there are no other relatives able to care for the child. Based on these reasons the trial court awarded DPS permanent custody of the minor child and terminated all legal rights of the parents.
This court has held that where there is a dispute over custody of a child between a natural parent and one who is not a natural parent the natural parent is presumed to be the best custodian for the child. Borsdorf v. Mills, 49 Ala. App. 658,275 So.2d 338 (Ala.Civ.App. 1973). To remove custody from the natural parent, the trial court must have before it clear and convincing evidence that it would not be in the child's best interests to remain with the natural parent. Vinson v. AGAPE ofCentral Alabama, Inc., 416 So.2d 1075 (Ala.Civ.App. 1982);Massey v. Massey, 410 So.2d 422 (Ala.Civ.App. 1981). And, where there appear less drastic measures than permanent removal of parental custody, the trial court must consider those measures before terminating parental rights. Lovell v. Department ofPensions Security, 356 So.2d 188 (Ala.Civ.App. 1978).
In the instant case the trial court determined that the child's best interests would be served by placing its permanent custody in DPS, and terminated the natural mother's parental rights. Where the trial court hears the evidence ore tenus, its judgment is presumed correct, unless it be shown that the judgment is plainly and palpably wrong. Hudgins v. State,418 So.2d 913 (Ala.Civ.App. 1982). The judgment is not plainly wrong.
The evidence shows that the child has been in DPS's custody since she was three months old. The mother is financially and emotionally unstable and is incapable of supporting herself, much less providing for the care, protection, and control of a child. Also, it is quite obvious from the record that the use of less drastic measures than permanent deprivation was tried on many occasions. The trial court and DPS worked with the mother in regard to establishing a relationship with the child. Miss Roland was given overnight and weekend visitation rights and the chance to rehabilitate herself and regain custody of her daughter. Yet, the mother disobeyed the court order by taking the child out of the jurisdiction of this court and by not properly caring for the child. The evidence also *Page 308 
shows that DPS tried to place the child with relatives or with the alleged father. These efforts produced no viable results.
The judgment of the trial court is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.