MURDOCK, Judge.
On remand from this court, see Ex parte W.T.M., 851 So.2d 55 (Ala.Civ.App.2002) {“W.T.M. Ill”), the trial court awarded custody of A.M.A., a dependent child, to V.T. and her husband, E.T. V.T. is the sister of the appellant in this case, W.T.M. W.T.M. appeals from those portions of the trial court’s judgment providing for counseling for A.M.A. and for visitation between A.M.A. and S.P., A.M.A.’s former foster mother, and A.M.A.’s former foster siblings. We affirm.
This is the fifth time that issues related to the custody of A.M.A. have been before this court. See W.T.M. v. Department of Human Res., 736 So.2d 1120 (Ala.Civ.App. 1999) (“W.T.M. 7”); W.T.M. v. S.P., 802 So.2d 1091 (Ala.Civ.App.2001) (“W.T.M. 77”); W.T.M. III; and Ex parte E.T., [Ms. 2020423, September 12, 2003] — So.2d -(Ala.Civ.App.2003) (“W.T.M. TV”).
Much of the history of this case was recited in W.T.M. TV:
“A.M.A. was born in September 1996. When A.M.A. was seven months old, the Department of Human Resources (‘DHR’) obtained protective custody of her based upon a dependency petition that alleged that A.M.A. had been born a ‘crack baby’ and that her mother was using cocaine and not providing adequate care for her. When A.M.A. was nine months old, S.P. became her foster mother.
“A.M.A.’s parents have never been married to each other; however, in February 1998, W.T.M. was judicially determined to be A.M.A.’s father. In March 1998, W.T.M. and his sister, S.B., jointly *574 petitioned for joint custody of A.M.A., alleging that W.T.M. had suffered a disabling stroke and was unable to care for the child without help. Questions arose, however, as to the suitability of S.B. and her husband to receive custody of the child, and, after a dispositional hearing in August 1998, the juvenile court ordered that the child remain in the custody of DHR, with foster-care placement. W.T.M. and S.B. appealed that order, but the appeal was dismissed by this court as untimely in W.T.M. 1.
“In May 1999, another sister of W.T.M., V.T., moved to intervene and, along with her husband, E.T., petitioned the juvenile court for custody of A.M.A. In June 1999, S.P., who by then had been the child’s foster mother for approximately two years, also moved to intervene for the purpose of seeking custody. The juvenile court granted both motions to intervene.”
— So.2d at -.
The juvenile court conducted an eviden-tiary hearing in February 2000 at which that court heard extensive testimony from numerous witnesses. At the time of the hearing, A.M.A. was three and one-half years old and had lived with S.P. almost three years. It was undisputed that S.P.’s home was suitable for A.M.A., that A.M.A. was a happy and loving child, and that S.P. and A.M.A. had a very close and loving relationship. S.P. testified that she and the child had bonded as mother and daughter. Even V.T. admitted that S.P. had “done a pretty good job of raising” the child and that the child was well-adjusted, outgoing, and vivacious.
The record reflects that S.P., who was 41 years old at the time of the February 2000 hearing, had three other foster children (two boys and one girl — ages 8, 7, and 5, respectively), all of whom she had had custody of for over four years and was attempting to adopt. A representative of the Department of Human Resources (“DHR”) testified that the four children, who had grown up together, were “very, very bonded.... They’re extremely close. The two boys ... that’s their sister and [A.M.A.] thinks of [the other foster children] as those are my brothers and [sister].”
The record also reflects that S.P. and the children regularly attended church together and that the children likewise participated in Sunday school and in a missions program held at the church on Wednesday nights. S.P.’s sister, who lives in Georgia, testified that she and her three children visited S.P. “every two or three months,” that the sister’s family and S.P. and the four children S.P. cared for had spent Thanksgiving together each of the last three or four years, and that the families had spent Christmas together along with S.P.’s mother and another sister. The record also reflects that S.P.’s mother regularly assisted S.P. in caring for the four children and that A.M.A. had formed a positive relationship with S.P.’s extended family.
A representative of DHR testified at the February 2000 hearing that, although DHR’s policy was to seek a relative for placement when an appropriate relative could be located, in the representative’s five and one-half years of experience with DHR she had never known DHR to remove a child from a home after the child had been placed in the home as an infant and had remained in the home for three years!
On the basis of the evidence it received in the February 2000 hearing, the juvenile court entered an order in March 2000 awarding custody of A.M.A. to S.P. and granting specific visitation rights to W.T.M. and to V.T. and E.T. The juvenile *575 court’s March 2000 judgment stated, in part:
“After reviewing the law submitted by counsel for the parties, and hearing argument regarding the burden of proof required in this cause, this Court finds that said Petitions filed by [V.T. and E.T.], and by [S.P.] should be considered as Petitions to Modify the child custody Order issued by this Court on August 7, 1998, granting custody of [A.M.A.] to [DHR]. In modification proceedings, the standard of proof is set out in [Ex parte McLendon, 455 So.2d 863 (Ala.1984)], whether a change in custody would materially promote the welfare of the child. The reason for this stricter standard is that uprooting children and moving them can be very traumatic.
“This Court finds that there have been no substantial changes in circumstances as presented by [V.T. and E.T.] that would materially promote the welfare of [A.M.A.] by changing custody from [S.P.] to [V.T. and E.T.] This Court notes that [A.M.A.] has been in the custody of [S.P.] during the past 2$ years where according to DHR reports [S.P.] has provided [A.M.A.] with a loving, nurturing environment and excellent care. Due to the fact that [A.M.A.] was found dependent by this Court on September 23, [1997], pursuant to Title 12-15-71(a)(3)(c), Alabama Code 1975, a child found dependent may be awarded to a relative or other individual who, after study by [DHR], is found by the Court to be qualified to receive and care for the child. Therefore, the care, custody, and control of [A.M.A.] ... is hereby awarded to [S.P.], with whom [DHR] placed [A.M.A.] approximately 2% years ago.”
In W.T.M. II, this court concluded that the juvenile court, by applying the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984), had applied the wrong standard, and this court remanded the case with instructions for the juvenile court to apply the “best interest” standard. On June 22, 2001, on remand from W.T.M. 11, the juvenile court entered the following order:
“In accordance with an Order issued by the Alabama Court of Civil Appeals, ... instructing this Court to apply the ‘best interest’ standard in this disposi-tional hearing of a dependent child, this Court finds that it is in the best interest of [A.M.A.] that her custody remain with [S.P., the foster mother] who has had physical custody of [A.M.A.] for the past 3-1/2 years and has provided [A.M.A.] with a loving and nurturing environment, and excellent care. [V.T. and E.T.] shall have the standard rights of visitation with [A.M.A.] as previously Ordered by this Court on March 7, 2000.”
From the juvenile court’s June 2001 order, W.T.M. and V.T. and E.T. appealed to this court. W.T.M. also petitioned for a writ of mandamus. This court reversed the juvenile court’s judgment and denied W.T.M.’s petition for a writ of mandamus in W.T.M. III. In an order dated December 13, 2002, the Alabama Supreme Court denied S.P.’s petition for a writ of certiora-ri because of S.P.’s failure to comply with various provisions of Rule 39, Ala. R.App. P.
From December 2002 through February 12, 2003, the juvenile court received numerous motions and other filings from the parties. On January 7, 2003, the juvenile court entered the following order:
“[I]n accordance with the Order issued by the Alabama Court of Civil Appeals [in W.T.M. Ill] said custody of [A.M.A.] is hereby awarded to [V.T. and E.T.] .... Over objection of ... [V.T. and E.T.], DHR [is] ordered to arrange fam *576 ily counseling for [A.M.A.] to assist her in the transition of custody. [V.T. and E.T.] are encouraged to allow [A.M.A.] to have contact with her previous custodian and foster siblings to promote the child’s emotional well being.”
On January 10, 2003, the guardian ad litem filed with the juvenile court a motion that reads as follows:

“MOTION FOR IMMEDIATE VISITATION

“COMES NOW, the Guardian Ad Li-tem ... in the above styled case and respectfully files this Motion for Immediate Visitation on the following grounds:
“1. That [S.P.], foster parent of [A.M.A.], has been the only ‘Mother’ [A.M.A.] has known.
“2. That [A.M.A.’s] brothers and sister are deeply upset and do not understand why their sister is going to be taken away from their family.
“3. That [A.M.A.] has attended school and church on a regular basis which is in the best interest of [A.M.A.] that she continue in these activities.
“4. [A.M.A.] was enrolled in a extracurricular activity, which she enjoyed and attended on a regular basis and it would be in [A.M.A.’s] best interest that [S.P.] be allowed to continue this extra-curricular activity with [A.M.A.]
“5. That [S.P.] provided a loving Christian environment for [A.M.A.] that continuing a relationship with [S.P.] would be in the best interest of [A.M.A.]
“6. In the last Order of Judge Schil-leci, custody was given to [S.P.] Therefore, visitation was not an issue at the time. Later on, the Court of Appeals reversed this Court’s decision on the issue of custody, therefore, the Guardian Ad Litem requests that this Court now address the issue of visitation with [S.P.]
“WHEREFORE, PREMISES CONSIDERED, the Guardian Ad Litem ask that this Honorable Court grant Visitation with [S.P.]”
On February 12, 2003, the juvenile court entered the order giving rise to the present appeal. That order stated, in pertinent part:
“[Pjursuant to the Alabama Juvenile Justice Act, § 12-15-1.1, this Court finds that it is in the best interest of [A.M.A.] that [S.P.] and [A.M.A.’s] foster siblings have the following visitation with [A.M.AJ:
“1) On the first and third weekends of each month from 6:00 p.m. Friday until 6:00 p.m. the following Sunday.
“2) Two weeks during the summer selected by [S.P.] but upon written notice to the custodians at least 30 days in advance of said visitation.
“3) Other and different times of visitation may be exercised by agreement of the parties, without prejudice to the other periods of prescribed visitation.
“4) [S.P.] is responsible for transporting [A.M.A.] during visitation unless otherwise agreed upon by parties.
“Said visitation is to begin immediately and is ordered by this Court so that the well being of [A.M.A.] will be protected during her change of custody to [V.T. and E.T.], so that [A.M.A.] will develop a sense of security and stability during the transition. DHR has been ordered to provide counseling for [A.M.A.] under the supervision of a qualified therapist to address any trauma of uprooting [A.M.A.] from her prior foster *577 home. Said DHR is ordered to provide this Court with a copy of said counsel- or’s report every 60 days regarding the progress of [A.M.A.’s] transition.
“It is clear that [S.P.] may pursue any appellate review of this case and this Court will abide by any ruling if appropriate. Said case file ordered closed.”
W.T.M. first argues that this court’s opinion in W.T.M. Ill limited the scope of the trial court’s authority on remand. As a result, according to W.T.M., the juvenile court was prevented from entering a final judgment that accomplished anything other than an award of sole custody to V.T. and E.T., with no visitation between A.M.A. and S.P. or A.M.A.’s former foster siblings.
In support of his position, W.T.M. relies on Ex parte S.T.S.,- 806 So.2d 836 (Ala. 2001). Unlike the present case, which involves a dependency proceeding, Ex parte S.T.S. was a custody case. The opinion in Ex parte S.T.S. addressed the propriety of certain factual findings by a trial court following the remand of the case to it by the Court of Civil Appeals; those findings were contrary to the findings made as a matter of law by the Court of Civil Appeals in the opinion remanding the case.[1] Following the trial court’s entry of a judgment on remand, the Supreme Court held that “[bjecause the trial court entered the ... judgment [on remand] on the same record as that before the Court of Civil Appeals [in the case that led to the remand], the facts on which the Court of Civil Appeals’ decision was predicated continue to be the facts of the case, and, therefore, the Court of Civil Appeals’ conclusions in its 1999 opinion are the law of the case.” 806 So.2d at 341-42.
For the reasons discussed below, we find Ex parte S.T.S. not to be controlling of the proper disposition of the present case. Nothing in this court’s opinion in W.T.M. Ill prevented the trial court on remand from receiving additional evidence or from making the factual findings that it has made in determining that visitation with S.P. and A.M.A.’s former foster siblings would be in A.M.A.’s best interest.
We begin our analysis by reiterating what was stated in the main opinion in W.T.M. IV:
“W.T.M. Ill was a plurality opinion; only two of the five judges of this court concurred in the reasoning by which the main opinion in W.T.M. Ill reached the results that it did. Those results were (1) the reversal of a particular judgment, the juvenile court’s June 2001 judgment that had awarded custody of the child to S.P. based on the evidence presented in the February 2000 hearing, and (2) the denial of the father’s petition for a writ of mandamus.”
— So.2d at-(footnote omitted). As was done in W.T.M. TV, we also emphasize that this case involves a dependency proceeding:
“It was a proceeding with both judicial and nonjudicial aspects that was initiated and, in its nonjudicial aspects, administered by DHR. Moreover, the dependency process is a dynamic and ongoing process in which the trial court may be, and typically is, called upon repeatedly to determine what disposition of the child is in the child’s best interest. That is, the court is called upon to make such a determination at the outset of the dependency *578 and, then, as developments in the lives of the child and the child’s parents may warrant, the court makes other such determinations from time to time during the course of the dependency proceeding until that process is concluded.”
W.T.M. TV, — So.2d at-. As it is called upon to make succeeding determinations as to the temporary and, eventually, the permanent disposition of a child in a dependency proceeding, nothing prevents the trial court from conducting succeeding evidentiary hearings to receive evidence of factual developments in the life of the child and the other parties, and their relationships, since earlier hearings. In fact, it is contemplated by the statutory scheme in § 12-15-1 et seq., Ala.Code 1975, and it is typically necessary that the trial court will conduct such successive evidentiary hearings in a dependency proceeding.
The main opinion in W.T.M. TV states:
“The fact that the juvenile court’s June 2001 judgment was reversed in W.T.M. Ill with only a plurality opinion (i.e., without an opinion of ‘the court’) and that it was a judgment in an ongoing dependency proceeding, bears significantly upon the issue of what this court did and did not do in W.T.M. 111. Given the foregoing, this court did not mandate an award of custody to V.T. and E.T.; nor did this court mandate any particular disposition of the child. Nor did this court, by reversing one attempted disposition of the child at one particular point in time, dictate to the juvenile court when it would be in the child’s best interest, absent that particular disposition, to close the dependency proceeding or to make some other disposition of the child.”
— So.2d at -. Nor did this court prohibit the juvenile court from holding subsequent evidentiary hearings or from effecting or implementing whatever disposition it might eventually make in a manner the court might find to be in the child’s best interests at a subsequent time, all in accordance with the Alabama Juvenile Justice Act. See Ala.Code 1975, § 12-15-71(a)(1) and (4); Ala.Code 1975, § 12-15-1.1. What this court did do in W.T.M. Ill was reverse a particular judgment of the juvenile court, entered in June 2001, awarding primary custody of the child to S.P. based upon the facts demonstrated to exist in February 2000. In other words, the “result” reached in the appeal in W.T.M. Ill was the reversal of one attempted disposition of the child by the juvenile court.
As was further stated in W.T.M. TV:
“The dependency proceeding at issue in this case is a proceeding that was initiated by DHR in 1997, in conjunction with taking the child into protective custody and placing her in foster care with S.P. Neither V.T., E.T., nor S.P., were parties to the dependency action at its inception. During the course of the dependency proceeding, however, V.T. and E.T. eventually filed a motion asking that they be allowed to intervene in the proceeding and asking that the juvenile court award custody of the child to them. S.P. filed a similar motion at about the same time in which she asked that she be allowed to intervene and that the juvenile court award custody of the child to her.
“The juvenile court might have denied both motions to intervene, or it might have denied both motions seeking a dis-positional judgment and allowed the dependency proceeding to continue, subject to subsequent dispositional motions filed by DHR or other parties that might thereafter intervene. The fact that it chose to grant the motions to intervene and to make an award of cus *579 tody to one of the intervenors does not, ipso facto, mean that when that particular judgment is reversed the trial court necessarily must immediately conclude the dependency proceeding or make a final dispositional custody award to the other intervenor.
“The only mandate of this court in W.T.M. Ill was the reversal of the June 2001 disposition that had been attempted by the juvenile court. Nothing in that mandate prevented the juvenile court from concluding on remand, assuming the record supported such a conclusion, that absent that attempted disposition, it would be in the child’s best interest for the dependency proceeding to remain open for some additional period without a final dispositional order. Similarly, had the record on remand supported the conclusion that it would be in the child’s best interest, perhaps because of developments since the February 2000 hearing that reflected adversely on the paternal aunt and uncle as prospective custodians for this particular child, or because of developments in the life of the child since the February 2000 hearing, to award custody to some party other than V.T. and E.T., there was no mandate from this court that prevented the juvenile court from doing so. Nor were other options that were available to the court under § 12-15-71, Ala.Code 1975, necessarily foreclosed by this court’s opinion. In other words, there was no mandate by this court as to exactly how or when or in what particular manner to bring this dependency proceeding to a close.[3]
“Accordingly, there was no mandate by this court .in W.T.M. Ill that removed an award of visitation rights to the child and her foster mother and foster siblings, whether in aid of the implementation of an award of primary custody to another party or otherwise, from among the court’s available options under § 12-15-71. When the juvenile court had earlier granted custody to the foster mother on remand after W.T.M. II, it awarded visitation to the father, W.T.M., and to two nonparents, E.T. and V.T., because it determined, pursuant to § 12-15-71, that it would be in the child’s best interests to do so. Following the reversal of that judgment by this court in W.T.M. Ill, nothing prevented the juvenile court, when it awarded primary custody of the child to E.T. and V.T., from ordering that that custody arrangement should be implemented with visitation between the child and her foster mother and foster siblings, if that arrangement was deemed by the court, pursuant to § 12-15-1.1 and § 12-15-71, to be in the child’s best interests.
[[Image here]]
*580 W.T.M. IV, — So.2d at -.
W.T.M. also argues that the trial court’s order of January 7, 2003, was a final judgment and that the trial court did not have jurisdiction to enter the February 12, 2003, order giving rise to this appeal. We have previously addressed this issue in W.T.M. IV in addressing the mandamus petition of V.T. and E.T. Our decision in W.T.M. TV, in which we rejected the same argument, is dispositive in the present ease.
The trial court’s action in this matter was governed by § 12-15-71(a), Ala.Code 1975. That statute provides, in pertinent part:
“If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:
“(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
“(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources.
“(8) Transfer legal custody to any of the following:
“a. The Department of Human Resources; provided, that the department is equipped to care for the child.
“b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
“c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.
“(4) Make any other order as the court in its discretion shall deem to be for the ivelfare and best interests of the child.”
(Emphasis added.)
Consistent with § 12-15-71(a), we have long stated in both child-custody and dependency cases that the primary concern is the best interests and welfare of the child. E.g., McKinney v. Alabama Dep’t of Pensions & Sec., 475 So.2d 568 (Ala.Civ.App.1985); Melton v. State Dep’t of Pensions & Sec., 448 So.2d 392 (Ala.Civ. App.1984); Price v. Price, 440 So.2d 1110 (Ala.Civ.App.1983).[2] At the time of the *581 trial court’s order at issue, A.M.A. was approximately six and one-half years old and had lived with S.P. and the foster siblings for almost six years. In providing for the counseling and the visitation challenged in this appeal by W.T.M., the juvenile court clearly took into consideration the bonds between the child and her foster mother and foster siblings forged from having lived with S.P. and the other children virtually her entire life. We likewise conclude that it was appropriate for the trial court, in determining A.M.A.’s best interest and welfare, “to consider ties of affection resulting from years of association between the child and its custodian.” Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (1975) (custody determination in a divorce case).
“The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living. Out of the actual relationship of parent and child love grows. It is not merely a product of the biological function of conception and giving birth. To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child.”
Borsdorf v. Mills, 49 Ala.App. 658, 661-62, 275 So.2d 338, 341 (1973). See generally Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
It would appear not only that the trial court acted consistently with this court’s mandate in W.T.M. Ill that it apply a “best interest” standard, but that it did so entirely consistently with § 12-15-71(a) and the policy concerns explained in the above-cited cases. Based on the record presented, the judgment of the trial court is affirmed.
AFFIRMED.
THOMPSON and PITTMAN, JJ., concur in the result, without writing.
CRAWLEY, J., dissents, with writing, which YATES, P.J., joins.

. Among other things, the Court of Civil Appeals had held: "We find no evidence to support a conclusion that the father relinquished his custodial rights or that he is unfit to properly care for his son," whose custody was at issue in that case. S.T.S. v. C.T., 746 So.2d 1017, 1020 (Ala.Civ.App.1999).

“3 ‘[Wjhere [an appellate] court gives no precise directions on remand as to how a case is to proceed as to a certain matter, the lower court may proceed in any manner that is not inconsistent with the [appellate] court’s opinion.’ Durbin v. Durbin, 818 So.2d 409, 411 (Ala.Civ.App.2001). As discussed, there was no opinion of the court in W.T.M. Ill — only a plurality opinion. The reversal of the juvenile court’s June 2001 order, based as it was on the juvenile court’s February 2000 hearing and the evidence adduced at that hearing, was the only mandate of this court in W.T.M. III. The plurality opinion concluded by merely stating that ‘[t]he judgment of the juvenile court is reversed.’ 851 So.2d at 61. Indeed, given the ongoing and dynamic nature of the dependency proceeding, no remand was even necessary. It was enough for this court, as it did, to simply reverse the June 2001 judgment that was presented. A fortio- *580 ri, it would not have been proper to remand this case for the entry of a judgment based on the same February 2000 hearing that served as the basis for the judgment this court reversed. The facts shown at that hearing had no doubt long since been superseded by over two years of further developments in the lives of the child and of the parties.”

. Despite the fact that W.T.M., as A.M.A.’s biological father, does not have physical custody of A.M.A. or responsibility for A.M.A.’s welfare in light of the custody award to V.T. and E.T., he nonetheless brings this appeal complaining of the final disposition by the trial court awarding visitation between A.M.A. and her former foster mother and former foster siblings. Even our law's recognition of a presumption of custody in favor of a biological parent, however, finds its genesis in the concern for the best interests of the child:
“The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their *581 education and morals will be duly cared for.”
Striplin v. Ware, 36 Ala. 87, 89 (1860) (quoted with approval in Ex parte D.J., 645 So.2d 303 (Ala.1994)). See also Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983) ("The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right ... is in the best interest and welfare of the child as a matter of law.”).